[No. 1419.]

## TOM WATSON *v.* THE STATE.

1. BIGAMY.—INDICTMEMT for bigamy may sufficiently charge the offense without alleging the name of the first spouse.

2. SAME—CHARGE OF THE COURT—CASE STATED.—A mistake of fact, based upon a letter received, informing the accused of the death of his first wife, was the defense interposed by the accused to a prosecution for bigamy. Upon this question the court instructed the jury, viz.: "A mistake by defendant as to the death of the first wife before the second marriage, if such mistake did not arise from the want of proper care, will excuse an act committed under such mistake." * * * * "By 'proper care,' which the defendant must use, is meant such care as ordinary men would use to ascertain the truth of a report of like importance upon which they may be required to act. If the mistake is shown to have existed, and that it was not caused by want of such proper care, the jury will acquit. If by such proper care defendant, from the testimony, could have corrected the mistake, then the mistake, if it existed, will avail nothing as a defense; but the jury may consider the belief by defendant of his first wife's death, if such belief be shown, in mitigation of punishment, should the defendant be convicted." *Held*, that the last clause of the charge, which undertakes to define the words "proper care," is erroneous, and should have been omitted. See the opinion *in extenso* on the subject.

3. SAME.—Article 45 of the Penal Code provides: "No mistake of law excuses one committing an offense; but if a person laboring under a mistake as to a particular fact shall do an act which would otherwise be criminal, he is guilty of no offense." Article 46 of the Penal Code provides: "The mistake as to a fact which will excuse, under the preceding article, must be such that the person so acting under a mistake would have been excusable had his conjecture as to the fact been correct; and it must also be such mistake as does not arise from a want of proper care on the part of the person committing the offense." *Held*, that it was the duty of the

court to charge the substance of the above articles, leaving to the jury to determine from the evidence whether or not the mistake of the defendant, if a mistake, arose from want of proper care.

4. MISTAKE OF FACT.—"Proper care," in avoiding mistake of fact, is a question which is controlled by the particular facts or circumstances of the particular case, and is an issue which is to be determined by the jury upon the evidence adduced.

APPEAL from the County Court of Travis. Tried below before the Hon. A. S. Walker.

The indictment in this case was for bigamy. It charged that the appellant, having a living wife, on the fourth day of December, 1881, unlawfully married one Rebecca Garner. He was convicted, and was awarded one year's confinement in the penitentiary as punishment.

John Crawford testified for the State that he knew the defendant and knew his first and his second wives, both of whom he pointed out in court. The defendant's first wife lives on Baldwin's place, in Bastrop county. They were married in April or March, 1879, and immediately commenced the cultivation of a crop of corn. The witness heard the defendant speak of having borrowed a horse from Charles Caldwell, and riding to Bastrop county, where he got married. His first wife is a cousin of the witness. The witness then lived in Hays county, and had lived in the same neighborhood nine years. When the witness went to Bastrop county in March or April, 1879, defendant and his first wife were living together as man and wife, and the defendant told the witness that he and the witness's cousin (the first wife with whom he was living) were married. The first wife is still living, and lives on the same place. From the time the defendant and she were married, up to the time when the witness left, in August, 1879, they lived together. The witness has heard of the defendant living in Hays and Travis counties. He lived with this first wife in Hays county for a short time. The witness first heard that the defendant had married again in April, 1882, and with his second wife was living on Bear Creek. The witness had never heard the defendant say that he was married to this last wife.

Cross-examined, the witness testified that he had known the defendant for fifteen or sixteen years, and declared that he and the first wife were married in Bastrop county. He had heard the defendant so assert the fact, and knew that they lived to-

gether as man and wife. They separated in August, 1879. The defendant was a man of poor education and could neither read nor write. The witness was a man of limited education, but could read a little, and could sign his name. He identified a letter offered in evidence as one which the defendant showed him at a camp on Bear Creek, but declared that he did not know who wrote it. He did not write it, nor did he ever see it until the defendant showed it to him on the occasion spoken of. The witness saw J. Crawford on the day that he first saw the letter and talked to him about it. He told J. Crawford that he did not write the letter, and that it was his impression that it was written by the defendant's first wife. Witness told his uncle (J. Crawford presumably) that he did not know Caroline's handwriting, and that the handwriting looked more like that of his, witness's, wife, or of Miss Martin, than it did like the handwriting of the defendant's former wife.

The witness reiterated, on re-examination, that he did not write the letter, and that he did not know who did. He did not know that he had ever seen handwriting similar to it. The letter was signed with the witness's name, but the name was not correctly spelled. The name to the letter was signed "Crofford," whereas his name properly spelled was "Crawford." The witness's wife and Miss Martindale knew how to spell his name. The second wife was present when the defendant showed the witness the letter. He brought the letter to the witness from his camp. The first wife, before her marriage with defendant, was a widow, named Catherine Peebles.

Frank Brown, county clerk of Travis county, being sworn, produced the record of marriages, showing a marriage license issued to defendant and Rebecca Garner, December 13, 1881, and returned executed by D. C. Pace, justice of the peace.

D. C. Pace testified that, in December, 1881, he was a justice of the peace in Travis county, and as such performed the marriage ceremony between the defendant and Rebecca Garner, at Jake Crawford's place, in Travis county. Jake Crawford, the witness's father, and some children, were present.

The letter referred to reads as follows:

"Nov. 18, 1881, Bastrop County.
"Mr. Thomas Watson:
"It is with pleasure that I sit down to inform you that I am well, and hope you are the same. Tom, I am sorry to tell you that

your wife is dead and has been for a week, but I suppose as you and her is separated, you do not care to hear anything about it. Times is good here, and I wish you would come down and see us and spend a few days and talk of old times.   I have not much to say this time, but write and let me know how you are getting along.   Hoping to hear from you soon,

"I remain your friend,

"JOHN CROFFORD."

Rebecca Garner testified, for the defense, that she could neither read nor write, but she had seen the letter used in evidence. The defendant brought it to her, sealed up.   She opened it and laid it away ten days before she and the defendant were married.   The witness's daughter looked at it, but could read only the first part of it.   Her father, William Crawford, read a part of it, and then the witness gave it to her brother.   The witness, her daughter, and her aunt took it to Mrs. Bates, who read it to her.

On cross-examination, the witness stated that she would not have married the defendant had she known that his first wife was living, nor did she believe that the defendant would have entered into a marriage with her if he had known it.   He told the witness of his living wife long before their marriage, and it was understood between the two that he should secure a divorce, after which they were to be married.   The witness had no reason to doubt the statements of the letter reporting the death of the defendant's first wife, and made no inquiry concerning the truth of that report.   The defendant had always treated her and her children kindly.   The two have not lived together since the first rumors that the first wife survived commenced circulating.

Mary Crawford testified that she was sixteen years old, and was the daughter of the last witness.   She saw the letter in evidence when the defendant received it.   It was then opened, and postmarked "Caldwell P. O., Bastrop county."   It was opened, and the witness read part of it.   It was then carried to Mrs. Bates, who read it entire in the presence of the witness.

Jake Crawford, for the defense, testified that he was a brother to Mrs. Garner.   He was illiterate, and could neither read nor write.   At the request of defendant, the witness went to Bastrop county some three years ago to move him, and to prevail, if possible, upon his first wife to return to him.   She refused.   The defendant did not quit his first wife, but was driven off by her.

She is a half sister to the witness. The witness procured the license for the defendant to marry Rebecca Garner, his last wife. He then knew of the letter reporting the first wife's death, and had he not believed it, he would not have permitted this last marriage. John Crawford told the witness that the handwriting of the letter looked like that of his wife or Mollie Martindale, and that he did not write it.

Madden, deputy postmaster at Oatmanville, testified that he remembered giving the defendant a letter, about the last of November, 1881, which he supposed came in due course of mail. It was the only letter he remembered that the defendant ever received at that office.

H. C. Still testified that he had known the defendant for about four years. He knew him to be very simple, but if he had any bad traits about him, the witness did not know it.

Mary Crawford recalled, stated that she was mistaken in testifying that the letter when received bore the "Caldwell P. O." postmark. It was postmarked "Bastrop County," in a circle.

John Crawford in rebuttal testified that he lived within a mile of Caldwell Postoffice. It is a small postoffice and has no stamp postmark. The postmaster writes the postmark. The witness on cross-examination stated that he hated the defendant.

The appellant's motion for new trial complained of the charge of the court, and that the verdict was against the law and the evidence. The motion being overruled, appeal was prosecuted.

*R. J. Hill* and *T. H. Wheless*, for the appellant.

*H. Chilton*, Assistant Attorney General, for the State.

WILLSON, J. The defendant was convicted upon an indictment, the charging portion of which is as follows: "did then and there unlawfully marry Rebecca Garner, he, the said Watson, then and there having a wife then living." Exceptions to this indictment were overruled. The exceptions were, that it did not put the defendant upon notice of the charges against him, in this: that it does not charge the name of the alleged first wife of the defendant. While this indictment does not follow established precedents (2 Whart. Prec. Indict, 985; 2 Archibold's Cr. Pr. and Pl., 1813; *May* v. *The State*, 4 Texas Ct. App., 424), still we are not prepared to say that it is a bad indictment. It charges the offense substantially in the language of the statute,

and ordinarily it is sufficient to do this. The weight of authority is that it is not necessary to state the name of the first wife. (2 Whart. Prec. Indict., 985, note *c.*) We are of the opinion that the exceptions to the indictment were properly overruled.

The defense relied upon by the defendant was, that when he married the second wife he believed that his first wife was no longer living. In support of this defense, it was proved that the defendant resided in Travis county, and his first wife resided in Bastrop county; that, a short time before he married the second wife, he received a letter by mail, signed "John Crofford," and purporting to come from Bastrop county, informing him of the death of his first wife. "John Crawford" (the supposed writer of this letter) testified that he did not write it; that he lived in Bastrop county, near defendant's first wife, and was well acquainted with defendant; that his impression was, when he first saw the letter, that it had been written by defendant's first wife, but he had told Jake Crawford, his uncle, and a brother of defendant's second wife, that the handwriting of the letter looked like that of his (John Crawford's) wife, or that of Mollie Martindale. The witness Jake Crawford saw the letter, and being satisfied that it was genuine, and that defendant's first wife was in fact dead, he consented to his marriage with his sister. The second wife also testified that she saw the letter, and, believing that it was all right, married the defendant. It was also in proof that the defendant was illiterate—could neither write nor read, and was very simple.

Under this state of facts, the court charged the jury as follows:

"A mistake by defendant as to the death of the first wife before the second marriage, if such mistake did not arise from the want of proper care, will excuse an act committed under such mistake. By *proper care*, which the defendant must use, is meant such care as ordinary men would use to ascertain the truth of a report of like importance upon which they may be required to act. If the mistake is shown to have existed, and that it was not caused by want of such *proper care*, the jury will acquit. If by such *proper care* defendant, from the testimony, could have corrected the mistake, then the mistake, if it existed, will avail nothing as a defense; but the jury may consider the belief by defendant of his first wife's death, if such belief be shown, in mitigation of punishment, should the defendant be convicted."

F

It is insisted by defendant's counsel that the foregoing charge is erroneous, and, after a careful consideration of the question, we are of the opinion that the latter clause of the same, which undertakes to instruct the jury as to the meaning of the words "proper care," is erroneous, and should have been omitted from the charge. We do not think that the court was called upon to explain these words to the jury. They are not technical words having a fixed legal meaning unknown to the unprofessional minds, but are plain, common, well understood words, as easily comprehended as any used in the statute.

The Penal Code provides as follows:

"Art. 45. No mistake of law excuses one committing an offense; but if a person laboring under a mistake as to a particular fact shall do an act which would otherwise be criminal, he is guilty of no offense.

"Art. 46. The mistake as to fact which will excuse, under the preceding article, must be such that the person so acting under a mistake would have been excusable had his conjecture as to the fact been correct; and it must also be such mistake as does not arise from a want of proper care on the part of the person committing the offense."

We think the learned judge should have given in charge to the jury, substantially, the above articles, leaving the jury to determine from the evidence in the case whether or not, under all the facts and circumstances of that particular case, the mistake of the defendant, if he was mistaken, arose from a want of proper care on his part. The question as to *proper care*, we think, depends upon the facts in each particular case. No general rule can be prescribed in relation to it. What would be proper care in one case might be gross negligence in another. What would be *proper care* when considered with reference to one individual might not be when applied to another. The learned judge, in the charge under discussion, defines "proper care" to be such as *ordinary* men would use, etc. Why not also explain to the jury what constitutes an "ordinary man?" Was the defendant an "ordinary man?" Were the jury any more competent to determine this question without instructions from the court than they were to determine the question as to what would constitute proper care? We think the charge of the court was improper when applied to the evidence in this case, in so far as it instructed the jury in the meaning of the statutory words "proper care," and that it was calculated to injure the rights of

the defendant; and because of this error the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

Opinion delivered October 25, 1882.